512 P.2d 27

**Ed Otis LOCKLER, Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Producers Minerals Corporation, Respondent Employer,**

**Home Insurance Company Respondent Carrier.**

**No. 1 CA–IC 739.**

Court of Appeals of Arizona, Division 1, Department B.

July 19, 1973.

Spencer K. Johnston, Phoenix, for petitioner.

William C. Wahl, Jr., Chief Counsel, The Industrial Commission of Arizona, Phoenix, for respondent Industrial Commission.

Glen D. Webster, Jr., Phoenix, for respondents employer and carrier.

JACOBSON, Chief Judge, Division 1.

This review of an award of the Industrial Commission denying benefits raises the question of whether the injured workman sustained his burden of proving that his cerebral stroke was causally related to or precipitated by his employment.

Petitioner, Ed Otis Lockler, was employed by respondent, Producers Minerals Corporation, as a night watchman at its mining operation located near Safford, Arizona. His duties as night watchman consisted merely in checking vehicles that entered or left his employer's premises and obtaining bills of lading for delivery. Several days prior to August 13, 1971, the employer, in order to better regulate the flow of traffic to and from its premises, installed a gate at the entrance to its mining properties. This gate was constructed of a pipe frame covered with a wire mesh and weighed between 300 and 400 pounds. The gate rested on two large rollers which carried its weight and was held in a vertical upright position by two additional rollers located on the top of the supporting frame. These rollers were stationary and the gate slid back and forth over the rollers in opening and closing. The effort required

to open and close this gate was in dispute and this dispute relates directly to the causation of the petitioner's condition.

For some time prior to August 13, 1971, petitioner had suffered from dizziness and headaches and for three days prior to the incident complained of a tingling sensation in his arm. Petitioner was 59 years old at this time. He had suffered a previous heart attack and had undergone a colon operation.

On August 13, 1971, petitioner reported to work at 6 p. m. complaining of dizziness and a headache. His work was apparently uneventful until approximately 11 p. m. that evening. At the hearing of this matter, petitioner testified that at approximately this time he was ordered to start opening and closing the newly-installed gate. He further testified that this was the first time he was called upon to perform this duty, the gate was heavy, required lifting to start its rolling, and that on the first occasion he tried closing the gate he noticed a tingling sensation in his arm and leg. His testimony was further that he continued to feel worse, felt dizzy, blacked out, and finally, after opening and closing the gate five or six times, he was compelled to lie down at approximately midnight. He performed no further work that night, was taken to a doctor the following morning, and was sent to a hospital in Tucson where his condition was diagnosed as a stroke (deficiency of blood supply to the brain.)

The petitioner's initial report described the accident as follows:

"On July 12th, 1970 [sic], I called Jack Robinson, mine superintendent, and said I was too ill to go to work. Was told there was no one to take my place. Went to work at 6 p. m. Went to work staggering and falling. Unable to get anyone to take me to a doctor until July 14th [sic] at 9 a. m."

The first indication that petitioner causally related the exertion in the opening and closing of the gate to his stroke came at the first hearing in this matter. Other workmen of the employer testified that the gate was newly installed, was in perfect working order, required no great exertion to operate it and this could be done with one hand.

Two doctors testified in this matter: Dr. J. Scott Tyler, testifying for the petitioner, and Dr. Richard R. Van Epps, testifying for the respondent insurance carrier.

Dr. Tyler, a neurologist, based upon an examination of petitioner on June 16, 1971 (approximately two months prior to the stroke) and an examination of other medical reports and files, testified:

"Q. Doctor, would you have an opinion with reasonable medical certainty and probability as to whether the incident or the incidents of the opening and closing of the gate for the first time the six times between 11:00 o'clock and midnight by Mr. Lockler—this being the first time he had been required to do this by the testimony—did or did not have a precipitating or causative effect upon the stroke occurring at the hour that it did?

"A. I do feel within a reasonable medical probability and certainty that the stroke was precipitated at that time by the labor which for him was unusual."

Dr. Tyler was explicit, however, in his qualifications of this opinion:

"Q. Would the main predicate of your opinion be that you considered the activity with respect to the gate as being unusual; is that the main part of your opinion?

"A. Yes, sir, this is a necessary hypothesis to my opinion.

"Q. In other words, if we take away the exertion being unusual then your opinion would be otherwise; is that correct?

"A. That is correct. I would like to draw an analogy on the heart which you have alluded to.

"Q. I just want to find the main predicate of your opinion. You assumed moving of the gate was unusual, and if it were not unusual, you would say it

would have no cause and effect relationship; is that right?

"A. That is right."

In elaborating upon this issue of "unusualness" the doctor testified:

"Q. Doctor, did you assume, then, that the unusualness is being that he had to pick up the gate to get it rolling; is that what you assumed?

"A. Not necessarily. I cannot say how many foot pounds of energy that would be required to be exerted before I would expect him to do this. I would specify that anything that would increase his pulse rate by more than about 15 beats per minute or something in that nature would be enough to perhaps cause a stroke.

"Q. Whether this gate, in fact did do that, you would have no way of knowing; is that correct?

"A. I have no way of knowing."

Dr. Van Epps, also a neurologist, based solely upon review of the medical reports and files, testified:

"Q. Doctor, based upon reasonable medical probability, can you state your opinion as to whether or not that any of the events that I have described to you, as far as the employment is concerned, in any way caused or produced or accelerated the stroke that occurred to Mr. Lockler? First, do you have an opinion?

"A. Yes.

"Q. What is that?

"A. If things are as such as you stated, I would think that it would have happened anyway. Let's put it that way.

"Q. Do you think any of the events of the employment produced or accelerated this man's condition that brought on the stroke?

"A. No."

The hypothetical question upon which Dr. Van Epps based his opinion, included the assumption that the exertion required to move the gate was "not unusual." This was also elaborated upon:

"Q. In other words, Doctor, can small exertion or little exertion cause the condition as found in Mr. Lockler?

"A. I don't see why it would. It really don't make sense to me why it would.

"Q. Let's even assume hypothetically that moving the gate was a little unusual; not too unusual, but a little unusual. What would your opinion be to that?

"A. I don't think it would change if it were a moderate amount of activity.

"Q. Is it your opinion that the moving of the gate was not the accelerating factor of the eventual stroke?

"A. No, if it just took a mild or moderate amount of effort to move it."

In petitioner's reply brief before this court, he questions the propriety of Doctor Van Epp's testimony based upon a file review without a personal examination of the petitioner, relying on the trilogy of Rutledge v. Industrial Commission, 108 Ariz. 61, 492 P.2d 1168 (1972); Condon v. Industrial Commission, 108 Ariz. 65, 492 P.2d 1172 (1972), and Pais v. Industrial Commission, 108 Ariz. 68, 492 P.2d 1175 (1972). The holding in these three cases, all released on the same day, was summarized in Pais v. Industrial Commission, *supra,* as:

"We have stated this day that a mere file review and comment on the evidence is not substantial evidence on which the Commission may base a conflict of medical testimony, when compared with contrary testimony of attending or examining physicians unless it has been clearly shown that a physical examination would not be of any conceivable benefit." 108 Ariz. at 70, 492 P.2d at 1177.

■ In making this argument, petitioner is somewhat on the horns of a dilemma, for his testifying physician made his examination of the petitioner some two months prior to the stroke occurring and for a

purpose apparently unrelated to his present condition. Dr. Tyler's opinion as to causation as to the stroke was also based upon a review of the medical reports and files. However, we are of the opinion that both doctors' testimony was material and properly before the Commission. There is no showing that an actual physical examination of the petitioner would have been of any conceivable benefit. Both doctors agree that petitioner suffered a stroke; they merely disagree as to the etiology of this condition. Dr. Tyler is of the opinion that a stroke can be caused by a drop in the blood supply to the brain and this in turn can be caused by muscle activity in other parts of the body requiring additional supplies of blood to the muscle and decreasing the available supply to the brain. Dr. Van Epps discounts this theory and subscribes to the thesis that a blockage of the blood vessel occurs by fatty material on the lining of the blood vessel breaking away and floating in the blood stream until it reaches a narrowing or obstruction (microthrombo-embolic phenomena). It is doubtful if physical examination of the patient would either prove or disprove these etiological theories.

However, an actual medical conflict does not really exist in the two doctors' testimony—Dr. Tyler's hypothesis being based upon an "unusual" exertion by the petitioner and Dr. Van Epps's hypothesis being based upon a "moderate" amount of activity. Thus, the factual conflict to be resolved by the hearing officer and the Commission was not one of medical testimony, but the factual basis for that testimony—the amount of exertion necessary to move the gate. While this testimony was in conflict, there was sufficient reliable evidence before the hearing officer that the operation of the gate was an easy, manual exercise and was not of sufficient character to give rise to the stroke. Based upon this resolution of fact, this court cannot substitute its judgment for that of the body in whose power the right to make the resolution exists. Breeding v. Industrial Commission, 14 Ariz.App. 513, 484 P.2d 666 (1971).

For the foregoing reasons, the award of the Commission is affirmed.

HAIRE and STEVENS, JJ., concur.

NOTE: Judge WILLIAM E. EUBANK having requested that he be relieved from consideration of this matter, Judge HENRY S. STEVENS was called to sit in his stead and participate in the determination of this matter.